**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mary A. Miller, | ) | No. CV 09-01871-PHX-JAT |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ————————————————— | ) | |

Pending before the Court is Plaintiff Mary A. Miller's appeal from the Administrative Law Judge's ("ALJ") denial of Plaintiff's application for Social Security disability benefits. For the reasons that follow, the Court remands this matter to the ALJ for further consideration.

**I.      PROCEDURAL HISTORY**

On December 29, 2004, Plaintiff filed an Application for Disability Insurance Benefits, alleging a disability onset date of July 22, 2004.  Record Transcript ("TR") 69. Plaintiff asserts that she is disabled due to migraine headaches, a back disorder, and a thyroid disorder.  TR 18.  Plaintiff's claim was initially denied on September 1, 2005, and Plaintiff timely requested a hearing, which was held on August 28, 2007.  TR 18.  The Social Security Administration ("SSA") denied Plaintiff's application, and found that Plaintiff was capable

1    of performing her past work as a credit collector.  TR 15, 25.  After Plaintiff's request for

2    review by the SSA Appeals Counsel was denied on July 10, 2009, Plaintiff commenced an

3    action before the District Court.  (Doc. # 25 at p. 15; Doc. # 26 at p. 2.)

4          Plaintiff filed a second application for disability benefits with the SSA (Doc. # 21 at

5    p. 2), and was found disabled as of October 24, 2007, due to migraine headaches and chronic

6    neck and back pain with bilateral upper extremity weakness (Doc. # 27 at p. 1).  By reason

7    of the SSA's subsequent decision that Plaintiff was disabled as of October 24, 2007, the

8    period in dispute in this appeal is limited to July 22, 2004 through October 23, 2007.  (Doc.

9    # 21.)  On November 15, 2010, the Court granted Plaintiff's motion to amend her complaint

10   to reflect that the period of Plaintiff's alleged onset date of disability as July 22, 2004

11   through October 23, 2007.  (Doc. # 22.)  The Court also set a new briefing schedule for the

12   parties.  (*Id.*)  Plaintiff subsequently moved for submission of the briefs on file (Doc. # 24);

13   however, the Court did not address this motion prior to the briefing deadlines, and the parties

14   filed their briefs according the Court's revised briefing schedule.

15   **II.    FACTUAL BACKGROUND**

16          **A.    Plaintiff's Disability Claim**

17          Plaintiff has not performed substantial gainful activity since July 22, 2004.  (Doc. #

18   25 at p. 16.)  Plaintiff alleges that she is disabled due to the following severe impairments

19   considered by the ALJ: amblyopia of the right eye with vision loss, migraine headaches,

20   hyperthyroidism (status: post thyroidectomy), degenerative dis disease (status: post remote

21   surgery in 1969), left hydronephrosis with impaired kidney function, a history of carpal

22   tunnel syndrome, and hypertension.  (*Id.* at p. 17.)

23          **B.    Plaintiff's Background**

24          Plaintiff was born on August 17, 1952, stands at 5 feet, 8 inches tall, and weighs 160

25   pounds.  TR 80, 89.  She lives alone in an efficiency apartment next door to her son.  TR

26   406–07.  Plaintiff does not have a college degree or post-secondary certification; however,

27   she did complete some college courses.  TR 108, 404.  Before applying for disability

28   benefits, Plaintiff worked as a credit collector on and off from 1988 to July 22, 2004.  TR

1    108. Plaintiff smokes cigarettes, and testified that she has tried to quit. She also testified that

2    she cannot smoke when she has a bad headache. TR 409.

3         On May 22, 2007, Plaintiff, representing herself, appeared before the ALJ for a

4    hearing. TR 394. Plaintiff brought additional documentation of her conditions, which the

5    ALJ added to the record. TR 394–95. The ALJ stated that he "might have to send [Plaintiff]

6    out for a consultative examination in light of all this new evidence." TR 395. Based on the

7    receipt of new evidence, the ALJ continued the hearing. TR 396.

8         A second hearing before the ALJ was conducted on August 28, 2007, at which time

9    Plaintiff, representing herself, testified about her alleged disability. TR 399–416. Plaintiff

10   testified that she takes prescription drugs for her headaches and for the side effects of her

11   headaches, including Fluoxetine (generic Prozac), Premarin, Vicodin, Zomig, and

12   Propranolol. TR 407. Plaintiff testified that she also takes Flexeril for pain in her back. TR

13   408. Plaintiff testified that in 1998, her vision and headaches got worse, and she started

14   taking leave from her employment under the Family Medical Leave Act. TR 404. Plaintiff

15   testified that she has headaches every day, all day with varying severity. TR 408.

16   Sometimes her headaches are so severe that she vomits and must administer her medicine

17   through a nasal spray. TR 405. Plaintiff testified that she was born with a lazy eye, and that

18   despite initial accommodations by her employer, her decreasing eyesight in her "good eye"

19   could no longer be accommodated. TR 405. Plaintiff testified that she had a "bad back"

20   since she was 15 years old, but that over the years it was getting worse. TR 406, 408.

21   Plaintiff testified that she has been treated for depression for the past two years, and that

22   Prozac helps. TR 408.

23        Additionally, Plaintiff testified that she has constant pain from her head down her

24   back, arthritis in her left hip, sciatica down her right leg, neuropathy in her arms and legs,

25   numbness and tingling in her hands and fingers, sore feet, carpal tunnel in both arms, flank

26   pain, a bladder disorder, severe hydronephrosis, and the need to have her left kidney

27   removed. TR 409–10. Plaintiff testified that even though she is in pain every day, she varies

28

1   her medications and does not take pain medication every day to avoid potential
2   ineffectiveness.  TR 411.

3       According to Plaintiff, she cannot lift things due to a herniated disc in her thoracic
4   spine and bulging discs in her mid-back.  TR 408.  Plaintiff testified that she has difficulty
5   walking and difficulty sleeping.  TR 408, 409.  Plaintiff testified that she has a driver's
6   license and drove herself to the hearing.  TR 406.  Plaintiff testified that she was an avid
7   reader, but no longer reads unless required, and that she no longer sews or uses a computer.
8   TR 410.  Finally, Plaintiff testified that when she goes grocery shopping, she must lean on
9   the grocery cart, and when she washes dishes, she leans "like an old woman," because she
10  cannot stand up straight.  TR 415.

11      **C.    Record Evidence**

12          **1.    Plaintiff's Impairments**

13      Plaintiff alleges that she became disabled on July 22, 2004, due to severe migraine
14  headaches with vision problems, dizziness, a bad back, back surgery, and thyroid surgery.
15  TR 80–81.  The medical records indicate that Plaintiff has a history of headaches, TR 133,
16  a history of sinus infections causing frontal sinus pain, TR 132, 147, right amblyopia and left
17  presbyopia, TR 133, and chronic back pain following surgery in 1969, TR 133, 169.

18      On March 25, 2003, Dr. Jeffrey L. Shy of Neurological Physicians of Arizona, Inc.,
19  examined Plaintiff for complaints of "lifetime headaches" that had been particularly
20  problematic over the prior five years.  TR 133.  Plaintiff claimed that, at least two times per
21  week, she had a diffuse severe throbbing headache with nausea, vomiting, light and sound
22  sensitivity, exertional increase, and problematic dizziness and blurry vision.  TR 133.
23  Plaintiff informed Dr. Shy that during her headaches, she was often incapacitated and unable
24  to work or function.  TR 133.  The results of Dr. Shy's neurological examination were
25  normal.  TR 134.  The impression was intractable chronic daily headache with intermittent
26  migraine without aura.  TR 134.  Plaintiff was prescribed Topamax, Imitrex, and Tramadol,
27  instructed to keep a headache diary, and asked to follow-up in eight weeks.  TR 134.  There
28

are no records indicating that Plaintiff returned for an eight-week follow-up examination or kept the headache diary.

On October 9, 2003, over seven months after the initial consultation, Plaintiff returned to Dr. Shy for a follow-up visit. TR 132. Plaintiff complained of chronic daily headaches with a "full-blown migraine episode" occurring one to two times per week. TR 132. Plaintiff admitted that she had ceased taking prescription Topamax before its effectiveness could be measured, even though her headaches were persistent and unchanged. TR 132. Plaintiff reported that oral triptans provided some relief from headaches, but she had problems vomiting up her medications. TR 132. Dr. Shy restarted Plaintiff's Topamax prescription and prescribed Imitrex. TR 132.

Between April and June 2004, Plaintiff was treated at Mesa Family Medical Center for sinusitis and headaches affecting her vision and causing dizziness and nausea. TR 140–44. X-rays of Plaintiff's hip and lumbar spine were normal. TR 142–43. A CT of Plaintiff's sinuses revealed no significant paranasal sinus disease. TR 139.

On June 12, 2004, Plaintiff was treated at the Southwestern Eye Center for her amblyopia, migraine headaches, and visual disturbances. Clinical notes indicate that Plaintiff was instructed to see a neurologist. TR 153.

On June 24, 2004, Plaintiff was treated at the Valley Lutheran Medical Center emergency room with a chief complaint of cephalgia with sinus pain and hypertension. TR 147–50. CT scan was negative. TR 147, 150. It was noted that Plaintiff had a chronic headache and chronic cephalgia. TR 148. Plaintiff responded to intravenous labetalol for her high blood pressure, and improved with narcotics for her cephalgia. TR 148. Plaintiff was discharged with instructions to follow-up with her regular care provider the next week. TR 148.

On July 14, 2004, Dr. Gilbert J. Toffol at Desert Neurocare, LLP, saw Plaintiff for a neurological consultation regarding her severe headaches. TR 206–10. Plaintiff reported that in the last three months her headaches were becoming more frequent, lasted longer, and were more severe. TR 206. She reported that she experienced dizziness, nausea, vomiting,

and blurred vision with her headaches, which generally lasted several days and resolved on their own. TR 206. Plaintiff stated that she is rarely pain free, and complained of balance difficulties, lack of coordination, and forgetfulness when she is in pain. TR 207. The impression was transformed migraines with and without aura, with further diagnostic studies necessary. TR 209. Plaintiff was diagnosed and treated for depression secondary to her chronic pain. TR 209.

On August 17, 2004, Plaintiff was seen by Dr. Toffol to review the results of her diagnostic exams. TR 203–05. Plaintiff reported that she had minimal improvement of her migraine headaches over the past month, and that she had been off work lately and not exposed to reading on the computer. TR 203. Plaintiff reported taking the hormonal replacements and nutritional supplements recommended by Dr. Toffol. TR 203. An MRI of Plaintiff's brain revealed minimal, nonspecific white matter hyperintensity, which occurs in individuals with migraines. TR 204. An MRA of the Circle of Willis was normal. TR 204. An MRI of Plaintiff's spine revealed some degenerative disc disease at C3-C4 with anterior osteophyte formation and anterior disc bulging, but no focal disc herniation, spinal canal stenosis or neural forminal narrowing. TR 204. An ultrasound revealed an enlarged left thyroid lobe with a dominant 3.7 centimeter nodule and a nodule on the right thyroid lobe. Plaintiff was referred to an endocrinologist for follow-up. TR 204. An EMG with nerve conduction studies was normal. TR 204. Laboratory studies were within normal range. TR 204. Dr. Toffol prescribed Topamax, as an additional medication for prophylactic treatment of Plaintiff's migraine headaches, and instructed Plaintiff to continue with Zomig and Vicodin for abortive treatment. TR 205. Finally, Plaintiff was referred to an ophthalmologist for her persistent blurred vision, and instructed to return for a follow-up in four weeks. TR 205.

Plaintiff returned to Dr. Toffol on September 21, 2004, and reported that her migraines were essentially unchanged in frequency or intensity. TR 201–02. Plaintiff reported that her mood was more relaxed, and that with her prescription for Lexapro, she was less anxious. TR 201. Dr. Toffol increased Plaintiff's prescription for Topamax in hopes

that it would be more efficacious in preventing migraine headaches.  TR 202.  On October 19, 2004, Plaintiff returned for a follow-up exam, and reported that she continues to have migraine headaches.  TR 200.  Plaintiff reported that her severe migraine headaches occurred several times per week, and her severe low-grade headaches occurred daily.  TR 200.  Dr. Toffol increased Plaintiff's prescriptions of Lexapro and Topamax.  TR 200.

On November 23, 2004, Plaintiff returned to Desert Neurocare, and complained of a very severe migraine headache that occurred twice the prior week, which included nausea and vomiting.  TR 199.  Plaintiff reported that her thyroid nodule would be removed after her ophthalmology evaluation.  TR 199.  Plaintiff also reported significant blood pressure fluctuations trending more towards the high side, regardless of the headache pain.  TR 199.

Plaintiff was seen by an ophthalmologist in December 2004.  TR 197.  According to ophthalmologist, Plaintiff's blurred vision was not due to any major eye pathology, but likely due to Plaintiff's migraine headaches.  TR 197.

On January 27, 2005, Plaintiff had a total thyroidectomy, due to a thyroid gland cyst.  TR 164–80.  During a follow-up appointment on February 22, 2005, Dr. Thomas J. Ketterer noted that Plaintiff failed to keep multiple post-operative appointments, but that overall, she was doing "extremely well" and on thyroid replacement.  TR 181.

On March 22, 2005, Plaintiff reported to Dr. Toffol that she still experienced severe recurrent headaches.  TR 195.  Dr. Toffol noted that Plaintiff's next appointment with the endocrinologist was scheduled to occur in two weeks, and that he would like to re-evaluate her after that post-thyroidectomy evaluation. TR 195. Dr. Toffol stated that in the meantime, Plaintiff "should not return back to work since her headaches are still very incapacitating." TR 195.  Two weeks later, Plaintiff reported to Dr. Toffol that she was "around 50% improved on Topamax 100 mg once daily."  TR 192.  Dr. Toffol increased Plaintiff's Topamax prescription and ordered monthly evaluations of Plaintiff.  TR 192.  On May 15, 2005, Dr. Toffol stated that he was "happy to report that [Plaintiff] is perhaps more than 50% improved while on Topamax," and that Plaintiff was "doing very well at this point in time."  TR 191.  Plaintiff reported that she was relocating to Missouri.  TR 191.

1       On July 27, 2005, Plaintiff was evaluated by Dr. Michael E. Somers in Kansas City,

2   Missouri.  TR 237.  Dr. Somers performed an eye examination, and informed Plaintiff that

3   a neurologist would be trained to determine which medications would be most beneficial for

4   her migraine headaches.  TR 237.

5       On or about August 31, 2005, a "Physical Residual Functional Capacity Assessment"

6   of Plaintiff was performed by the State Agency Medical Consultants.  TR 238–45.  The

7   primary diagnosis listed was "vision loss" with "bad back, thyroid" listed as other alleged

8   impairments.    TR 238.    According  to  the  report,  no  exertional,  manipulative  or

9   communicative  limitations  were  established.    TR 239, 241, 242.    Postural  limitations

10  included climbing ramp/stairs (occasionally) and ladders/ropes/scaffolds (never).  TR 240.

11  Visual limitations included depth perception and field of vision, with limited accommodation

12  necessary.  TR 241.  Environmental limitations included concentrated exposure to hazards,

13  such as machinery and heights.  TR 242.  With respect to Plaintiff's symptoms, it was

14  reported that Plaintiff "does have some headaches," but that she was "doing very well."  TR

15  243.

16      On September 13, 2005, Plaintiff was seen by Dr. John H. Amick for a new patient

17  evaluation.    TR 276–77.    Dr. Amick's  review  of  symptoms  included  severe  chronic

18  migraines, hypertension, and depression.  TR 276.

19      A November 2005 MRI of Plaintiff's thoracic spine showed central/left paracentral

20  disc herniation with cord deviation and compression, and minimal annular disc bulge.  TR

21  279.  Electrodiagnostic testing of Plaintiff in November 2005 showed moderate bilateral

22  carpal tunnel syndrome and early bilateral ulnar neuropathy at the elbow, but no evidence

23  of radiculopathy, peripheral neuropathy or other entrapment syndrome. TR 280.  A physical

24  examination of Plaintiff was negative for Hoffman's, Froment's and Tinel's signs, and

25  Phalen's maneuver. TR 280.  A January 18, 2006 CT of Plaintiff's spine showed very mild

26  rounded kyphosis, and scattered areas of degenerative change, including a large calcified

27  anterolateral extradural defect extending into the neural canal consistent with a calcified disc

28  fragment.  TR 281.

In February 2006, Plaintiff was treated at Kansas City Urology Care for hydronephrosis, and instructed to return in one year for an evaluation. TR 283–86.

On May 8, 2006 and June 6, 2006, Plaintiff was examined by Dr. Gail Francis at the Minneapolis Clinic of Neurology, Ltd., for migraine headaches and chronic pain issues. TR 342–47. Plaintiff reported being incapacitated and in bed for two to three days at a time due to headache symptoms. TR 344. Dr. Francis's assessment was intractable headaches, probably vascular in nature. TR 347. Dr. Francis administered an occipital nerve block, but Plaintiff did not respond, and was referred to a headache specialist. TR 342–43.

In June and July 2006, Plaintiff was treated for left-sided hydronephrosis at the Northeast Urology Clinic, P.A. TR 348–49, 358–62, 379–82, 387–88. It was determined that Plaintiff had a non-functioning left kidney, and removal of the kidney was discussed. TR 348.

## 2.    Recent Medical Assessments

During the initial hearing before the ALJ on May 22, 2007, the ALJ indicated that in light of the additional medical records presented by Plaintiff at the hearing, the ALJ "might have to send [Plaintiff] out for a consultative examination." TR 395. The ALJ stated that he would continue the hearing, review the new evidence, and determine whether it would be necessary to obtain a consultative examination. TR 396. A consultative examination was not obtained.

Prior to the second hearing before the SSA, on August 18, 2007, Plaintiff's treating physician Dr. Jennifer Auge completed a medical opinion form, in which she diagnosed Plaintiff with the following conditions: back pain, a kidney disorder, migraines, depression, and vision problems. TR 391. Dr. Auge opined that Plaintiff's conditions would last more than 30 days, and that Plaintiff was following the prescribed treatment plan. TR 391. Dr. Auge indicated that Plaintiff "*will not* be able to perform any employment in the foreseeable future," and stated that Plaintiff has been unable to work since 2004. TR 391. Finally, Dr. Auge indicated that Plaintiff suffered from mental illness. TR 391.

1

### 3.     Vocational Expert

2        During the August 28, 2007 hearing before the SSA, the Vocational Expert ("VE")

3   testified to Plaintiff's past work history and potential for future employment.  TR 412–15.

4   The VE testified that he had reviewed Plaintiff's vocational history.  TR 412.

5        The ALJ's first hypothetical concerned a woman of Plaintiff's educational and

6   vocational background.  TR 412.  This hypothetical person suffered from ophthalmic

7   migraine headaches, amblyopia of the right eye with vision loss, a history of amblyopia of

8   the left eye, hyperthyroidism status post-thyroidectomy, depression, bilateral carpal tunnel

9   syndrome, and left-sided hydronephrosis with impaired kidney functioning.  TR 412.  This

10  hypothetical person also had degenerative disc disease of the lumbosacral spine.  TR 412.

11  This hypothetical person was receiving treatment for a tempomandibular joint disorder or

12  dysfunction.  TR 412.  This hypothetical person had a history of degenerative disc disease

13  with surgery, neuropathy of the hands and feet, and degenerative joint disease of the hip.  TR

14  412–13.  The ALJ asked if this combination of impairments would limit the hypothetical

15  person to light work, which included occasionally lifting of 20 pounds and frequently lifting

16  10 pounds or less.  TR 413.  The hypothetical person would spend six hours during the eight

17  hour day on her feet, occasionally climbing stairs or ramps, and occasionally stooping,

18  kneeling, crouching or crawling.  TR 413.  The hypothetical person would not climb ladders,

19  ropes or scaffolds, and would not be exposed to unprotected heights or dangerous moving

20  machinery.  TR 413.

21        The VE found that this hypothetical person could perform Plaintiff's past work as a

22  credit collector.  TR 413.  The VE reminded the ALJ that Plaintiff's past work as a credit

23  collector was at the sedentary level.  TR 413.  The VE seemed to state that the hypothetical

24  person described above would be performing light work, not sedentary work.  TR 413.  The

25  ALJ then asked the VE if the hypothetical person was limited to sedentary work, whether she

26  could perform Plaintiff's past work as a credit collector.  TR 413.  The VE stated she could

27  perform that work.  TR 413.

28

1       The ALJ then posed a second hypothetical to the VE in which the hypothetical person

2   needed the ability to leave the workplace or be absent from the workplace for four or more

3   days [each month] without scheduling the absences in advance.  TR 413.  The hypothetical

4   person also needed the ability to take additional unscheduled breaks for unspecified durations

5   of time due to headaches.  TR 413.  The VE testified that the hypothetical person would not

6   be able to perform Plaintiff's past work, or any other jobs in the national economy.  TR 413.

7       Plaintiff was then given the opportunity to question the VE.  TR 414.  Plaintiff

8   expressed some confusion as to the meaning of the VE's testimony.[1]  TR 414, 415.  The ALJ

9   explained sedentary work as lifting only 10 pounds occasionally, lifting less than 10 pounds

10  frequently, and sitting six out of eight hours during the work day.  TR 415.  Plaintiff stated

11  that she could not perform sedentary work, because she needed to change positions all the

12  time.  TR 415.

13  **III.   LEGAL STANDARD**

14      To qualify for disability benefits under the Social Security Act, a claimant must show,

15  among other things, that the claimant is "under a disability."  42 U.S.C. § 423(a)(1)(E).  The

16  Social Security Act defines "disability" as the "inability to engage in any substantial gainful

---

17

18      [1] Based on the hearing transcript, it appears that Plaintiff neither understood the VE's

19  testimony, nor her right to present additional hypothetical questions to the VE:

    **ALJ**: And, Ms. Miller, well, did you have any questions about Mr. Ogren's

20      testimony?

21      **Plaintiff**: Yeah.  What did all that mean?

    **ALJ**: Well, like I said —

22      **Plaintiff**: Because at first it sounded like, you know, yes and a no. . . . Because

23      I understand the second part of it because no, you couldn't go get hired at a job

    and basically pick your own schedule. . . . So the first part of it I didn't

24      understand about she is able to do the sedentary meaning?

25      **ALJ**: Oh, well, sedentary work means lifting only 10 pounds, only up to 10

    pounds occasionally and frequent lifting of less than 10 pounds, and sitting six

26      out of eight hours.

27      **Plaintiff**: Oh, no.  I would not be, I have to change positions all the time.

    **ALJ**: Okay.

28  TR 414–15.

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A).  A person is "under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  The Social Security regulations set forth a five-step sequential process for evaluating disability claims.  20 C.F.R. § 404.1520; *see Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (describing the sequential process).  A finding of "not disabled" at any step in the sequential process will end the ALJ's inquiry.  20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof at the first four steps, but the burden shifts to the ALJ at the final step.  *Reddick*, 157 F.3d at 721.  The five steps are as follows:

1.      First, the ALJ determines whether the claimant is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, the claimant is not disabled.[2]

2.      If the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 404.1520(a)(4)(ii).  The "step-two inquiry is a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  If the claimant does not have a severe impairment, the claimant is not disabled.[3]

3.      Having found a severe impairment or impairments, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations.

---

[2] Here, Plaintiff does not challenge the ALJ's finding that Plaintiff did not engage in substantial gainful activity during the period of July 22, 2004 through October 23, 2007.  TR 20; Doc. # 25 at p. 16.

[3] Here, Plaintiff does not challenge the ALJ's finding that Plaintiff suffers from the following severe impairments: amblyopia of the right eye with vision loss, migraine headaches, hyperthyroidism (status: post thyroidectomy), degenerative disc disease (status: post remote back surgery in 1969), left hydronephrosis with impaired kidney function, a history of carpal tunnel syndrome, and hypertension.  TR 20, Doc. # 25 at p. 17.

1    20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is found disabled without considering the

2    claimant's age, education, and work experience.  *Id.* § 404.1520(d).  If the impairment or

3    impairments do not meet or equal a listed impairment, before proceeding to the next step, the

4    ALJ will make a finding regarding the claimant's "residual functional capacity based on all

5    the relevant medical and other evidence in [the] record."  *Id.* § 404.1520(e).  A claimant's

6    "residual functional capacity" is the most the claimant can do despite all her impairments,

7    including those that are not severe, and any related symptoms.  *Id.* § 404.1545(a)(1–2).

8         4.    At step four, the ALJ determines whether, despite the impairments, the

9    claimant can still perform "past relevant work."  *Id.* § 404.1520(a)(4)(iv).  To make this

10   determination, the ALJ compares its "residual functional capacity assessment . . . with the

11   physical and mental demands of [the claimant's] past relevant work."  *Id.* § 404.1520(f).  If

12   the claimant can still perform the kind of work she previously did, the claimant is not

13   disabled.  Otherwise, the ALJ proceeds to the final step.

14        5.    At the final step, the ALJ determines whether the claimant "can make an

15   adjustment to other work" that exists in the national economy.  *Id.* § 404.1520(a)(4)(v).  In

16   making this determination, the ALJ considers the claimant's residual functional capacity,

17   together with vocational factors (age, education, and work experience).  *Id.* § 404.1520(g)(1).

18   If the claimant can make an adjustment to other work, then she is not disabled.  If the

19   claimant cannot perform other work, she will be found disabled.  As previously noted, the

20   Commissioner has the burden of proving the claimant can perform other substantial gainful

21   work that exists in the national economy.  *Reddick*, 157 F.3d at 721.

22   **IV.    THE ALJ'S DECISION**

23        The ALJ evaluated Plaintiff's alleged disability according to the five-step evaluation

24   process set forth above.  TR 15–26.  As an initial matter, the ALJ determined that Plaintiff

25   has not engaged in substantial gainful activity since the alleged onset of her disability, July

26   22, 2004.  TR 20.  Next, the ALJ found Plaintiff suffered from the following severe

27   impairments: amblyopia of the right eye with vision loss, migraine headaches,

28   hyperthyroidism (status: post thyroidectomy), degenerative disc disease (status: post remote

1  back surgery in 1969), left hydronephrosis with impaired kidney function, a history of carpal

2  tunnel syndrome, and hypertension.  TR 20.  However, the ALJ concluded that Plaintiff's

3  impairments failed to meet the criteria of the third step.  TR 21.

4      The third step requires the ALJ to determine whether a claimant's impairment or

5  combination of impairments "meets or equals one of the SSA's listings in appendix 1 to

6  subpart P of part 404 of this chapter and meets the duration requirement."  20 C.F.R. §

7  416.920(a)(4)(iii); *see id.* § 404.1520(d).  The ALJ reviewed Plaintiff's severe impairments

8  under Sections 1.00 (Musculoskeletal System), 2.00 (Special Senses), 6.00 (Genitourinary

9  Impairments), and 9.00 (Endocrine System). TR 21  The ALJ found that Plaintiff "does not

10  have an impairment or combination of impairments that meets or medically equals one of the

11  listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4."  TR 21.

12      Next, as part of step four, the ALJ found that Plaintiff had the residual functional

13  capacity ("RFC") to perform light exertional level tasks.  TR 21.  The RFC is defined as "the

14  most [Plaintiff] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).  The ALJ

15  reduced Plaintiff's RFC to allow for a credible degree of pain, but found that the objective

16  medical records did not support a finding that Plaintiff's pain or functional limitations were

17  so severe as to keep her from working.  TR 25.  The ALJ stated that the wide range of

18  Plaintiff's daily activities were inconsistent with disability, but within the realm of the  RFC

19  for light work.  TR 25.  According to the ALJ, the objective medical evidence, the lack of

20  treatment, and the lack of significant pain medications, as well as other factors, failed to

21  support Plaintiff's allegations of her inability to work.  TR 25.

22      The ALJ did not reduce Plaintiff's RFC due to her hyperthyroidism, because she was

23  stable following the thyroidectomy and did not suffer complications. TR 22. The ALJ found

24  that because Plaintiff suffered from chronic back pain since 1969, but still sustained

25  substantial gainful activity, this strongly suggested that Plaintiff's back pain currently would

26  not prevent work. TR 23.  The ALJ also found that the RFC did not need to be reduced due

27  to Plaintiff's degenerative disc disease, because Plaintiff did not have neurological deficits,

28  mobility limitations, sensory deficits, or strength losses related to this impairment.  TR 24.

1    According to the ALJ, the RFC of light exertional tasks accommodated Plaintiff's pain

2    complaints and symptoms of degenerative disc disease.  TR 24.  The ALJ found Plaintiff's

3    alleged significant vision problems to be inconsistent with her ability to drive, her

4    ophthalmologist's report, and the fact that Plaintiff's right eye amblyopia did not prevent her

5    from working prior to July 22, 2004.  TR 24.  According to the ALJ, this strongly suggested

6    that Plaintiff's vision impairments would not prevent her from working currently.  TR 24.

7    However, the ALJ's RFC limits work around heights or dangerous moving machinery in

8    order to accommodate Plaintiff's vision loss in her right eye and her episodic complaints of

9    dizziness.  TR 24.  With respect to Plaintiff's diagnosis of left hydronephrosis with impaired

10   kidney function, the ALJ did not reduce the RFC, because Plaintiff denied urinary problems

11   on July 11, 2006, and her right kidney and bladder were functioning normally.  TR 24.

12   Finally, the ALJ did not reduce the RFC to accommodate Plaintiff's hypertension, because

13   it had been successfully treated.  TR 24.

14        Before determining the RFC, the ALJ found Plaintiff's statements concerning the

15   intensity, duration and limiting effects of her medically determinable impairments were "not

16   entirely credible."  TR 22.  Plaintiff testified that she was unable to smoke cigarettes when

17   she had a bad headache.  The ALJ found the fact that Plaintiff continued to smoke despite

18   her numerous complaints, diminished her credibility.  TR 23.  Further, the ALJ stated that

19   because Plaintiff did not take any steps to obtain different medication, then it could be

20   reasonably inferred that Plaintiff was satisfied with the effects of her present medications.

21   TR 25.

22        The ALJ gave little weight to the opinions of the State Agency Medical Consultants,

23   who found Plaintiff was capable of performing work at all levels of exertional activity,

24   because these non-examining, non-treating physicians did not review Plaintiff's most recent

25   medical evidence or hear her testimony.  TR 24.  The ALJ also gave little weight to the

26   opinion evidence of Dr. Jennifer Auge, because Dr. Auge's conclusion that Plaintiff would

27   be unable to perform any employment in the foreseeable future was supported only by the

28   conclusory comment that "patient has been unable to work since 2004."  Further, Dr. Auge

1  did not set forth specific functional limitations, and, according to the ALJ, her opinion was

2  "clearly inconsistent with other more persuasive and substantive evidence of record."  TR

3  24.  The ALJ gave substantial weight to the "objective medical evidence," including

4  Plaintiff's x-ray, EMG with nerve conduction studies, laboratory studies, CT scan, MRIs, and

5  direct motor testing.  TR 22–23.

6       The ALJ concluded his decision at step four of the sequential process, and found that

7  Plaintiff was not disabled.  Based on the RFC and the testimony of the VE, the ALJ found

8  that Plaintiff was capable of performing her past work as a credit collector, as such work was

9  actually and generally performed.  TR 25.  Accordingly, the ALJ held that Plaintiff was not

10  disabled under sections 216(i) and 223(d) of the Social Security Act.  TR 26.

11  **V.     STANDARD OF REVIEW**

12       A district court

13       may set aside a denial of disability benefits only if it is not supported
     by substantial evidence or if it is based on legal error.  Substantial
14       evidence means more than a mere scintilla but less than a
     preponderance.  Substantial evidence is relevant evidence which,
15       considering the record as a whole, a reasonable person might accept as
16       adequate to support a conclusion.  Where the evidence is susceptible to
     more than one rational interpretation, one of which supports the ALJ's
17       decision, the ALJ's decision must be upheld.

18  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (internal citation and quotation

19  omitted).  This standard of review exists, because "[t]he trier of fact and not the reviewing

20  court must resolve conflicts in the evidence, and if the evidence can support either outcome,

21  the court may not substitute its judgment for that of the ALJ."  *Matney ex rel. Matney v.*

22  *Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  Also under this standard, the Court will

23  uphold the ALJ's findings "if supported by inferences reasonably drawn from the record."

24  *Batson v. Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  However, the Court must

25  consider the entire record as a whole and "may not affirm simply by isolating a 'specific

26  quantum of supporting evidence.'"  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting

27  *Robbings v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

28

1    **VI.    ANALYSIS**

2         On appeal, Plaintiff argues that the ALJ committed legal errors in his assessment at

3    steps three and four of the sequential process, and that this matter should be remanded either

4    for further proceedings or a determination of benefits.  Asserting the SSA's final decision is

5    supported by substantial evidence and free of harmful legal error, the Commissioner asks the

6    Court to affirm the decision of the ALJ.

7         Plaintiff first argues that the ALJ erred at step three of the sequential process by not

8    considering Listing 11.03 (Epilepsy), 20 C.F.R. pt. 404, Subpt. P, App'x 1, in connection

9    with Plaintiff's migraine headaches and history.  Plaintiff also argues that the ALJ erred at

10   step four of the sequential process by not setting forth a function-by-function assessment of

11   Plaintiff's impairments and restrictions in determining Plaintiff had the RFC to perform a

12   range of light work.  Plaintiff further objects to the ALJ's failure to consider the effect of

13   Plaintiff's migraines on the RFC.  Plaintiff finally argues that the ALJ erred in not properly

14   considering Plaintiff's subjective complaints and the opinions of Plaintiff's treating

15   physicians.  Plaintiff argues, and the Court agrees, that the ALJ did not fully develop the

16   record prior to denying Plaintiff's application for disability benefits.

17        **A.    Consideration of Listing 11.03 in Step 3 Analysis**

18        In order for a claimant's impairment or combination of impairments to meet the

19   requirements of a listed impairment, all of the criteria of that listing and the duration

20   requirement must be satisfied.  *See* 20 C.F.R. §§ 404.1525(c)(1–3), 416.925(c)(1–3).

21   Medical equivalence will be found "if the medical findings are at least equal in severity and

22   duration to the listed findings."  20 C.F.R. § 404.1526(a); *see Marcia v. Sullivan*, 900 F.2d

23   172, 175 (9th Cir. 1990).  "*Marcia* simply requires an ALJ to discuss and evaluate the

24   evidence that supports his or her conclusion."  *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir.

25   2001).  A claimant must offer a plausible theory of how her combination of impairments

26   equals a listing before the failure to consider the issue will be error.  *Id.* at 514; *see Burch v.

27   Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the

28   combined effects of a claimant's impairments or compare them to any listing in an

1   equivalency determination, unless the claimant presents evidence in an effort to establish

2   equivalence.").

3          Plaintiff argues that the ALJ's failure to evaluate her severe impairments under Listing

4   11.03 constitutes legal error.  According to the ALJ's decision, the ALJ considered and

5   rejected Plaintiff's impairments under Sections 1.00, 2.00, 5.00 and 9.00 of the Listing of

6   Impairments.  TR 21.  The ALJ did not consider Listing 11.03.  Plaintiff argues that her

7   migraine headaches meet or equal Listing 11.03, and, therefore, she is disabled.  *See* 20

8   C.F.R. § 404.1520(d).

9          The Commissioner refers to the SSA's Question and Answer ("Q&A") 09-036, which

10  is attached to Plaintiff's reply brief, as the SSA's current guidance for determining whether

11  migraine headaches are a medically determinable impairment.  (Doc. # 27-1, App'x 4.)

12  According to the SSA, Listing 11.03 (Epilepsy - nonconvulsive epilepsy)[4] "is still the most

13  analogous listing for considering medical equivalence [of migraine headaches]."  Q&A 09-

14  036.  The Q&A describes the essential components of Listing 11.03, as those components

15  apply to migraine headaches: typical headache event pattern that is documented by detailed

16  descriptions, including all associated phenomena (*e.g.*, premonitory symptoms, aura,

17  duration, intensity, treatment), that occurs more frequently than once weekly with alteration

18  of awareness or an effect that significantly interferes with activity during the day (*e.g.*, need

19  for a darkened quiet room, lying down without moving, or sleep disturbance that impacts

20  daytime activities).  *Id.*

21

22

23

---

24       [4] Listing 11.03 of the SSA's Listing of Impairments provides, in full:
         Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal),
25       documented by detailed description of a typical seizure pattern, including all
         associated phenomena; occurring more frequently than once weekly in spite
26       of at least 3 months of prescribed treatment.  With alteration of awareness or
         loss of consciousness and transient postictal manifestations of unconventional
27       behavior or significant interference with activity during the day.

28  20 C.F.R. Pt. 404, Subpt. P, App'x 1.

The Commissioner argues that Plaintiff has not met her burden to present medical findings satisfying all the criteria of Listing 11.03 over 12 months. (Doc. # 26 at p.10.) Plaintiff disagrees, and refers the Court to the record, wherein Plaintiff's long history of migraine headaches is discussed. (Doc. # 27 at p. 2–3.) The record contains sufficient evidence that Plaintiff's migraine headaches may be analogous to the listing for epilepsy. For instance, Plaintiff cites to medical evidence describing Plaintiff's typical headache pattern, including associated phenomena, TR 199, 206–10, frequency of her migraine headaches, TR 132, 200, 203–05, interference with daily activity caused by her migraine headaches, TR 197–98, 237, 344–47, and existence of her migraine headaches for a period of at least 12 months, TR 133–34, 195, 370–72. The credibility of this medical evidence, which is largely anecdotal, must be determined by the ALJ upon remand.

The Court will not go so far as to determine whether Plaintiff meets Listing 11.03, but finds that there is sufficient evidence in the record for the ALJ to evaluate Plaintiff's migraine headaches under Listing 11.03. Accordingly, it was error for the ALJ not to consider Listing 11.03 in evaluating whether Plaintiff is disabled at step three of the sequential process. For this, and the additional reasons set forth below, the Court will remand this matter to the ALJ for further determination.

## B. Residual Functional Capacity Determination in Step Four Analysis

Plaintiff argues that the ALJ's failure to set forth a function-by-function assessment of Plaintiff's residual functional capacity or RFC makes the ALJ's decision legally deficient. The Court agrees, and remands this matter to the ALJ for a thorough RFC assessment, provided that the ALJ's inquiry on remand reaches step four of the sequential process.

As described above, at step four of the sequential process the ALJ determines whether, despite Plaintiff's impairments, Plaintiff can still perform her "past relevant work." 20 C.F.R. § 420.1520(a)(4)(iv). This determination is made by comparing the RFC assessment with the physical and mental demands of Plaintiff's past relevant work. *Id.* § 404.1520(f). The RFC is determined by the relevant medical and other evidence in a claimant's case record, and is considered to be the most the claimant is able to do despite her limitations. *Id.*

1    § 404.1545(a)(1).  Before making an RFC assessment, the ALJ is responsible for developing

2    a claimant's complete medical history, including arranging for consultative examinations,

3    if necessary.  *Id.* § 404.1545(a)(3).

4        A relevant Social Security Ruling[5] provides that "[t]he RFC assessment must first

5    identify the individual's functional limitations or restrictions and assess his or her work-

6    related abilities on a function by function basis."  Soc. Sec. Rul. 96-8p, 1996 WL 374184,

7    at *1 (July 2, 1996); *see Reed v. Massanari*, 270 F.3d 838, 843 n.2 (9th Cir. 2001) ("Notably

8    absent from the record before the ALJ was any assessment of Reed's RFC on a function-by-

9    function basis . . . .  A Social Security Administration ruling specifically warns against this

10   practice of determining a claimant's ability to perform past work on the sole basis of a

11   categorical RFC assessment.").  Accordingly,

12       At step 4 of the sequential evaluation process, the RFC must not be expressed
         initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,'
13       'heavy,' and 'very heavy' work because the first consideration at this step is
         whether the individual can do past relevant work as he or she actually
14       performed it.

15   Soc. Sec. Rul. 96-8p, at *3.  The Social Security Ruling states that "without the initial

16   function-by-function assessment of the individual's physical and mental capacities, it may

17   not be possible to determine whether the individual is able to do past relevant work as it is

18   generally performed in the national economy."  *Id.*  The Social Security Ruling further

19   recognized that the "[i]nitial failure to consider an individual's ability to perform the specific

20   work-related functions could be critical to the outcome of a case."  *Id.*; *see Pinto v.*

21   *Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (stating that the ALJ has the "burden to make

22

23

24       [5]  Social Security Rulings constitute the SSA's interpretations of the statutes it
     administers and of its own regulations. *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d
25   849, 851 (9th Cir.1996).  Although Social Security Rulings do not have the force of law, *id.*,
     once published, these rulings are binding upon ALJs and the Commissioner, *Holohan v.*
26   *Massanari*, 246 F.3d 1195, 1202–03 n.1 (9th Cir.2001); *Gatliff v. Comm'r of Soc. Sec.*
     *Admin.*, 172 F.3d 690, 692 n.2 (9th Cir.1999).
27

28

1  the appropriate findings to insure that the claimant really can perform his or her past relevant

2  work").

3      Here, the ALJ failed to set forth a function-by-function assessment of Plaintiff's

4  physical and mental capabilities.  The ALJ stated that Plaintiff had the RFC for "light

5  exertional level tasks with occasional climbing of stairs and ramps; occasional stooping,

6  crawling and kneeling; and, no work around heights or dangerous moving machinery."  TR

7  21.  The ALJ further defined "light work" by its generic definition as "work lifting 20 pounds

8  occasionally and frequent lifting or carrying of objects weighing 10 pounds, standing and/or

9  walking 6 of 8 hours, or sitting most of the time with some pushing and pulling arm or leg

10  controls."  TR 21.  In reaching the conclusion that Plaintiff's RFC is for "light work," the

11  ALJ did not make findings as to the functions that Plaintiff could perform in consideration

12  of her impairments, and the functions Plaintiff performed or was expected to perform on a

13  day to day basis as a credit collector.  It is unclear how the ALJ came to the conclusion that

14  Plaintiff is suited for "light work" despite her impairments, because the ALJ did not make

15  any findings as to Plaintiff's functional limitations or restrictions.

16      Even though the ALJ reported that Plaintiff's RFC would not preclude work in the

17  credit collection field, because it is a skilled sedentary occupation, TR 26, the ALJ failed to

18  make any specific findings as to the duration and frequency of the specific functions that

19  Plaintiff could perform.  The ALJ states that "[i]n comparing the claimant's residual

20  functional capacity with the physical and mental demands of this work, the [ALJ] finds that

21  the claimant is able to perform this past work as actually and generally performed."  TR 26.

22  However, the ALJ did not provide a function-by-function assessment before reaching this

23  conclusion.  Further, the ALJ did not describe of the functions of a credit collector.

24      Plaintiff further argues that the ALJ did not properly consider the effect of Plaintiff's

25  migraine headaches on her RFC.  Specifically, Plaintiff argues that, "[a]t a minimum, the

26  ALJ was required to identify the frequency, duration and severity of migraine headaches as

27  Defendant's vocational expert affirmed that migraine headaches causing unscheduled

28  absences or missed work at a rate of 4 or more per month is work precluding."  (Doc. # 25

at pp. 21–22.)  While there is no authority requiring the ALJ to make a specific frequency, duration and severity finding, the Court agrees that an assessment of Plaintiff's RFC invariably should include an assessment of Plaintiff's ability to attend work on a regular and continuous basis.[6]  The ALJ's decision does not appear to take into account the effect of Plaintiff's unscheduled absences on her ability to engage in substantial gainful activity.  The ALJ states that the RFC "accommodates the claimant's pain complaints and symptoms of degenerative disc disease," TR 24; however, the RFC does not account for unscheduled absences of any duration or frequency.  On remand, and assuming the ALJ reaches step four of the sequential process, the ALJ must address the VE's testimony that four or more days of unscheduled absences and the need to take unscheduled breaks for unspecified durations would not permit a person to perform any jobs that exist in the national economy.  TR 413.

As cautioned by the Social Security Ruling, without an initial function-by-function assessment of the claimant's physical and mental capacities, it may not be possible to determine whether the claimant is able to do past relevant work as it is generally performed in the national economy.  *See* Soc. Sec. Rul. 96-8p, at *3.  The ALJ's conclusory statement of Plaintiff's RFC and recitation of the generic definition of "light work" is not the equivalent of this assessment.  On remand, and assuming the ALJ reaches step four of the sequential process, the ALJ must identify Plaintiff's functional limitations or restrictions, and assess her work-related abilities on a function-by-function basis.

### C.    Consideration of Plaintiff's Subjective Complaints

With respect to Plaintiff's subjective complaints, the ALJ concluded "the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  TR 22.  Plaintiff argues that the ALJ failed to properly consider her subjective complaints.

---

[6] RFC is an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, where "regular and continuing basis" means eight hours a day for five days a week.  Soc. Sec. Rul. 96-8p, at *2.

If a claimant produces objective medical evidence of an underlying impairment, as Plaintiff did here, then the ALJ cannot reject the claimant's subjective complaints based solely on a lack of objective medical support for the alleged severity of the pain. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). When the ALJ finds the claimant's subjective pain testimony not credible, the ALJ must make findings sufficiently specific to allow the reviewing court to conclude that the ALJ rejected the testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. *Id*. at 856–57. If no affirmative evidence of malingering exists, then the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms. *Id*. at 857.

The Court concludes that the ALJ provided clear and convincing reasons supported by substantial evidence for not fully crediting Plaintiff's testimony. The ALJ found Plaintiff's treatment was conservative and consisted primarily of medication with minimal side-effects, which the ALJ considered was persuasive evidence that Plaintiff was not totally disabled. TR 25. The ALJ also found that the battery of tests performed were all negative and/or normal, which was objective evidence that Plaintiff's impairments were not as severe as Plaintiff claimed. TR 22–23. The ALJ stated that the fact that Plaintiff continued "to smoke [cigarettes] despite her numerous complaints diminished her credibility," because it "is well known that smoking is a contradiction for good health." TR 23. The ALJ also noted that Plaintiff suffered from chronic back pain since 1969, and yet the record reflects Plaintiff's ability to sustain substantial gainful activity despite this pain. TR 23 ("The fact that the chronic pain did not prevent the claimant from working prior to the onset date strongly suggests that it would not currently prevent work."). The ALJ also pointed out that Plaintiff's alleged vision problems were undermined by her ability to drive herself to the hearing. TR 24. While the ALJ stated that he recognized Plaintiff was suffering pain, the wide range of Plaintiff's daily activities was inconsistent with disability. TR 24 ("The claimant is self-sufficient in her activities of daily living. She is able to manager her self-care and household chores and living arrangements independently."). The ALJ considered Plaintiff's anticipation of the receipt of disability benefits, employer-based benefits, and

proceeds from the sale of her house to be economic disincentives to return to work. TR 25. The ALJ concluded his analysis of the credibility of Plaintiff's subjective complaints by stating that "[t]he objective medical evidence, the lack of treatment and/or need for significant pain medications, the claimant's daily activities and other factors all fail to support the claimant's allegations of inability to work." TR 25.

Contrary to Plaintiff's briefs, the ALJ gave "little weight" to the opinions of the State Agency Medical Consultants, because these non-examining, non-treating physicians did not review Plaintiff's recent medical records or hear Plaintiff's testimony, which the ALJ stated supported a reduction of Plaintiff's RFC. TR 24.

Despite Plaintiff's testimony concerning the severity of her impairments, the ALJ's interpretation is reasonable and supported by substantial evidence. It is not the Court's role to second guess the ALJ's fact findings. *See Rollings*, 261 F.3d at 857. Consequently, the Court rejects Plaintiff's argument that the ALJ improperly discredited her subject complaints. The ALJ gave clear and convincing reasons for discounting the severity and effect of her impairments based on Plaintiff's subjective complaints, and those reasons were supported by substantial evidence.

### D.    Consideration of Treating Physician Opinions

"The ALJ is responsible for resolving conflicts in the medical record." *Carmickle v. Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). Generally, "more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). However, where an opinion is contradicted, the ALJ may reject it for "specific and legitimate reasons that are supported by substantial evidence in the record." *Carmickle*, 533 F.3d at 1164 (quoting *Lester*, 81 F.3d at 830–31).

Plaintiff argues that the ALJ improperly ignored the opinions of Plaintiff's treating physicians concerning the severity of Plaintiff's headaches. Specifically, Plaintiff contends the ALJ's decision failed to address the opinion of Dr. Toffol that Plaintiff should not return to work during a two week period due to incapacitating headaches, TR 195, the opinion of

Dr. Michael Somers that Plaintiff "has disabling ophthalmic migraine headaches," TR 237, and the opinion of Dr. Gail Francis that Plaintiff did not respond to a nerve block and has intractable headaches, TR 342–47.[7]  While the ALJ does not have to accept a treating physician's opinion as true, the ALJ is required to provide specific and legitimate reasons for rejecting a contradicted opinion.  Based on the ALJ's decision, it appears that the ALJ ignored or summarily dismissed these opinions.  The Court does not quarrel with the Commissioner's argument that the Social Security Act has a very specific standard for determining disability, and that a doctor's use of the word "disabled" or a finding of disability by another agency does not carry significant weight.  However, the opinions of treating physicians do carry at least *some* weight, and the ALJ must set forth legitimate and specific reasons for discounting these opinions.

A treating physician's opinion can be discounted based on the results and findings of an independent consultative examination.  *Batson*, 359 F.3d at 1194–95.  On remand, if the ALJ finds it necessary to obtain a consultative examination, which was not previously obtained, the ALJ can potentially and reasonably discount the opinions of Plaintiff's treating physicians.  However, the ALJ is required to compare the records and reports prepared by various treating and consulting physicians, before concluding that the evidence, as a whole, supports a finding that Plaintiff had the ability to perform light work during the relevant time period.  If the ALJ finds an opinion to be contradicted by other parts of the record, then the ALJ must set for the specific and legitimate reasons for rejecting the medical opinion.  *Lester*, 81 F.3d at 830–31; *see* 20 C.F.R. § 404.1527(d)(2) ("We [the ALJ] will always give

---

[7] Plaintiff also cites the medical opinion prepared by Dr. Jennifer Auge, which states that Plaintiff could not perform work in the foreseeable future, TR 391, as an improperly ignored medical source opinion.  (Doc. # 25 at p. 29.)  However, the ALJ did review this opinion and concluded that Dr. Auge's opinion "is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion."  TR 24–25.  The ALJ goes on to state that this opinion "contrasts sharply with the other contemporaneous evidence of record."  TR 25.  On remand, the ALJ is instructed to set for the "other contemporaneous evidence of record" he is referring to, because the Court, based on its review of the record, does not find contemporaneous records to *contrast sharply* with Dr. Auge's opinion.

good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Accordingly, on remand, the ALJ is required to consider and weigh the opinions of Plaintiff's treating physicians.

### E.   ALJ's Duty to Fully Develop the Record

"The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting *Smolen*, 80 F.3d at 1288). When a claimant is not represented "the ALJ must be especially diligent," *id.*, and "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts," *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)). When "the heavy burden imposed by *Cox*" is not met, and the claimant may have been prejudiced, "the interests of justice demand that the case be remanded." *Vidal v. Harris,* 637 F.2d 710, 714–15 (9th Cir. 1981).

In *Celaya v. Halter*, the Ninth Circuit outlined the ALJ's heightened duty to fully develop the record when the claimant is not represented by counsel. 332 F.3d 1177 (9th Cir. 2003). There, the ALJ found that the claimant was not disabled because she could perform light work, including her past work as a presser for a dry cleaners, despite her impairments. *Id.* at 1180. The Ninth Circuit required the ALJ to "probe into, inquire of, and explore for all the relevant facts." *Id.* at 1183 (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)). The Court of Appeals remanded the case for development of the record on the claimant's obesity. *Id.* at 1184.

Plaintiff argues that the ALJ failed to fully develop the record when the ALJ failed to obtain a consultative examination. Plaintiff misreads the record. During the May 22, 2007 hearing, the ALJ stated that he "might have to send [Plaintiff] out for a consultative examination in light of all this new evidence." TR 395. The ALJ then continued the hearing to August 28, 2007, TR 399, but did not obtain a consultative examination.

Based on the reasoning throughout this Order, the Court finds that the ALJ has not met his burden of "assur[ing] that the claimant's interests are considered." *Tonapetyan*, 242

F.3d at 1150.  Specifically, the Court finds that the ALJ failed to fully develop the record with regard to the consideration of Plaintiff's migraine headaches under Listing 11.03, Plaintiff's functional limitations and restrictions in connection with determining Plaintiff's RFC, and the weight of her treating physician's opinions.  On remand, the ALJ also may find it necessary to obtain a consultative examination.

**VII.   CONCLUSION**

Because the Court finds that there are outstanding issues that must be resolved before a proper disability determination can be made, and because the ALJ has not fully and fairly developed the record in the manner described above, this matter must be remanded for a new determination regarding Plaintiff's entitlement to disability benefits.

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is vacated and the case is remanded for further proceedings.

**IT IS FURTHER ORDERED** that Plaintiff's Motion fo Submission on Briefs Filed is **DENIED** as moot.

DATED this 17th day of February, 2011.

James A. Teilborg
United States District Judge